STATE OF NORTH CAROLINA v. NORMAN DALE JOHNSON

No. 101

(Filed 6 November 1979)

1. **Criminal Law § 135.4; Homicide §§ 13, 31.1— first degree murder—plea bargain for life sentence prohibited**

   G.S. 15A-2000 and G.S. 15A-2001 do not permit a defendant in a capital case to enter a plea of guilty on condition that his sentence be life imprisonment but require that a jury be impaneled to determine the punishment to be imposed on a defendant who pleads guilty.

2. **Jury § 7.11— exclusion of jurors for death penalty views**

   The trial court in a bifurcated trial for first degree murder did not err in excluding for cause seven prospective jurors who stated that under no circumstances would they return a verdict which would result in the imposition of the death penalty.

3. **Jury § 6— capital case—denial of individual voir dire, sequestration**

   The trial judge in a first degree murder case did not abuse his discretion in denying defendant's motion for an individual voir dire of each prospective juror and for sequestration of jurors during voir dire.

4. **Criminal Law § 5— insanity—burden of proof**

   The decision of *Mullaney v. Wilbur*, 421 U.S. 684, does not require that the burden be placed on the State to refute the defense of insanity.

5. **Constitutional Law § 40— failure to appoint associate counsel for appeal**

   The trial judge did not abuse his discretion in denying defendant's motion for the appointment of associate counsel for his appeal from a conviction of

first degree murder where there is nothing in the record to indicate that defendant's appointed counsel failed to handle his appeal in a competent manner.

**6. Jury § 7.13— capital case—refusal to increase peremptory challenges**

The trial court in a first degree murder case did not err in refusing to increase the number of defendant's peremptory challenges because of pretrial publicity and the State's successful challenge for cause of prospective jurors opposed to capital punishment, since the trial judge is not authorized to permit a defendant in a capital case to exercise more than the 14 peremptory challenges allowed by G.S. 15A-1217.

**7. Criminal Law § 75.3— confession not tainted by prior acquisition of pistol**

Defendant's in-custody confession to a murder was not tainted by the State's prior acquisition of a pistol used by defendant in an unrelated homicide where the court found upon supporting evidence that no information about the pistol was obtained from defendant until after he was advised of his constitutional rights and that his statements were understandingly and voluntarily made after he was advised of his rights.

**8. Jury § 7.11— excusal of juror for death penalty views—harmless error**

The trial court in a first degree murder case erred in excusing for cause a juror whose answers on voir dire did not show that she was unequivocally opposed to the death penalty and would not under any circumstances vote for its imposition; however, defendant was not prejudiced by such error where the record does not indicate that any other juror was excused for cause who did not state that he was unequivocally opposed to the death penalty or that jurors who were impaneled were prejudiced against defendant or were otherwise not qualified or competent to serve.

**9. Criminal Law § 102.13— jury argument—no comment on possibility of parole**

The district attorney did not impermissibly suggest to the jury the possibility of parole in a first degree murder case when he argued to the jury that the only way to protect society, themselves and their children from defendant was to impose the death penalty.

**10. Criminal Law § 135.4— capital case—sentencing hearing—eyewitness account of gas chamber execution**

The trial court properly refused to permit defendant to present during the sentencing phase of a first degree murder trial an eyewitness account of a 1957 gas chamber execution.

**11. Criminal Law § 102.2— jury argument—review in capital cases**

In a capital case an appellate court may review the prosecution's jury argument even though defendant raised no objection thereto at the trial, but the impropriety of the argument must be gross indeed for the appellate court to hold that a trial judge abused his discretion in failing to correct *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

12. **Criminal Law § 102.6— capital case—improper jury argument—harmless error**

Assuming arguendo that during the sentencing phase of a first degree murder trial the district attorney improperly stated a personal opinion about the evidence and argued matters outside the record by injecting his experiences, stories he had heard and other cases in which he had been involved or of which he had knowledge, the impropriety was not so gross or excessive as to compel the appellate court to hold that the trial judge abused his discretion in failing to correct the arguments *ex mero motu* or that defendant is entitled to a new trial because of such arguments.

13. **Criminal Law § 135.4— capital case—failure of jury to agree within reasonable time—life imprisonment imposed—refusal to instruct**

The trial court did not err in refusing during the sentencing phase of a first degree murder trial to instruct the jury that its failure to agree unanimously on the sentence within a reasonable time would result in the imposition of a sentence of life imprisonment, since the trial judge's authority to impose a life sentence upon the jury's failure to agree upon a sentence within a reasonable time is not a proper matter for jury consideration.

14. **Criminal Law § 135.4— sentencing phase of capital case—motion to impose life sentence after jury had deliberated for some time**

The trial judge in a first degree murder case did not abuse his discretion in denying defendant's motion for imposition of a sentence of life imprisonment when the jury failed to return a verdict after deliberating for two hours and thirty-nine minutes.

15. **Criminal Law § 135.4— refusal to set aside jury's death sentence recommendation**

The trial judge did not err in refusing to set aside the jury's sentence recommendation of death in a first degree murder case since (1) the evidence was sufficient to support the jury's finding that the killing was "especially heinous, atrocious, or cruel," and (2) the jury's sentence recommendation is binding on the trial judge and he does not have the power to disturb such recommendation.

16. **Criminal Law § 154.5— settlement of record on appeal—no right of appeal**

The action of the trial judge in settling the record on appeal is final and will not be reviewed on appeal, defendant's remedy, if any, being by certiorari.

17. **Criminal Law § 126.3— affidavit and newspaper clipping—exclusion from record—impeachment of verdict—possibility of parole—photographs taken into jury room**

In this first degree murder case, the trial judge did not err in excluding from the record on appeal a juror's affidavit stating that photographic exhibits of the victim's body were taken into the jury room and a newspaper clipping indicating that the possibility of parole was a major consideration in the jury's deliberations on whether to recommend the death penalty since the affidavit and clipping would serve only to impeach the verdict; evidence concerning the jury's consideration of the possibility of parole would be excluded by G.S. 15A-1240(a); and the affidavit concerning the photographs could not be con-

sidered pursuant to G.S. 15A-1240(c)(1) because the photographs had been admitted into evidence and consideration of them would not "violate the defendant's constitutional right to confront the witnesses against him."

**18. Criminal Law § 135.4— first degree murder—instructions on "impaired capacity" mitigating circumstance**

In a first degree murder prosecution in which there was evidence from which the jury could have found that, although defendant knew the difference between right and wrong at the time of the killing, he suffered from schizophrenia and his schizophrenia had surfaced at the time of the killing, defendant is entitled to a new sentencing hearing because of the trial court's failure to explain to the jury the difference between defendant's capacity to know right from wrong and the *impairment* of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law within the meaning of G.S. 15A-2000(f)(6).

**19. Criminal Law § 135.4; Homicide § 20.1— erroneous admission of photographs of victim's body—harmlessness in guilt phase—prejudice in sentencing phase**

The trial court in a first degree murder case erred in the admission of photographs depicting the child victim's body as it appeared two months subsequent to his death after it had been dismembered by animals where there was no evidence that defendant mutilated or dismembered deceased's body. Such error was harmless beyond a reasonable doubt in the guilt determination phase of the trial but constituted prejudicial error in the sentencing phase and entitles defendant to a new sentencing hearing.

Justice EXUM dissenting in part.

APPEAL by defendant from *Seay, J.*, 19 June 1978 Session of ALEXANDER Superior Court. This case was docketed and argued as No. 19 at the Spring Term 1979.

Defendant was charged in an indictment proper in form with the first degree murder of Robert Alonzo Bartlette III. Prior to arraignment, defendant tendered a plea of guilty to first degree murder upon the condition that he be sentenced to a term of life imprisonment or in the alternative a plea of guilty to second degree murder without condition. The court rejected the tendered pleas, and defendant entered a plea of not guilty.

At the guilt determination phase of the trial, the State presented evidence which tended to show that on 4 September 1977 defendant was fishing in the Catawba River in Alexander County where he saw the deceased, Bobby Bartlette, a ten year old boy. Defendant decided to go to a nearby creek to continue his fishing, and young Bartlette accompanied him. Thereafter, defendant offered the boy ten dollars to have sex with him, and

when Bartlette refused, defendant strangled him with a nylon fish stringer. There was evidence that either during or after the killing defendant perpetrated a sexual assault upon the victim. In addition to the statement defendant made after his arrest confessing the killing, the State also introduced over defendant's objection pictures of the victim's body as it appeared when found some two months after the killing.

Defendant testified that after Bartlette refused to have sex with him "something snapped in my head and I strangled him. I think I had sexual contact with him but I am not sure." Defendant also testified that he has difficulty getting along with people; that he has tried to kill himself on many occasions; that he has never been able to do anything particularly well, except fish; that he doesn't like anyone except his minister and wants to kill everybody he does not like. He stated on cross-examination that it did not bother him that he killed Bobby Bartlette and that he "would probably do it again . . . . After killing the boy, I didn't feel anything. Not bad, not grief, in a way, I guess I felt good."

Dr. James Groce, a staff psychiatrist at Dorothea Dix Hospital, testified that he examined defendant and in his opinion defendant suffered from schizophrenia.

The jury returned a verdict of guilty of first degree murder.

The State offered no additional evidence at the sentencing phase of the trial.

Defendant's brother testified that during childhood, their home life was difficult and their father was a tyrant. He stated that defendant was very helpful and always willing to do things for people. He also testified that as a child, defendant "played with ants and on one occasion tortured a cat that had been run over by an automobile."

Nora Paige, a neighbor, testified that defendant's co-workers teased him about being a virgin, which upset him a great deal. She also related one incident which indicated that defendant might have schizophrenic tendencies.

The jury found as an aggravating circumstance that the murder was especially heinous, atrocious or cruel. As mitigating circumstances, the jury found that: (1) the murder was committed

while defendant was under the influence of mental or emotional disturbance; (2) defendant has no significant history of prior criminal activity; and (3) there was another (unspecified) circumstance which the jury deems to have mitigating value. The jury further found beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty. Based on these findings, the jury recommended that defendant's punishment be death.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*Edward L. Hedrick for defendant appellant.*

BRANCH, Chief Justice.

[1] Defendant first contends that the trial judge erred in construing G.S. 15A-2000 and G.S. 15A-2001 as not allowing a defendant to enter a plea of guilty on condition that his sentence be life imprisonment. We are of the opinion that the pertinent provisions of the statutes involved support the trial judge's ruling which, in effect, recognized that he had no authority to waive the requirement that a jury be impaneled to recommend punishment when a defendant enters a plea of guilty. G.S. 15A-2000(a)(2) provides in pertinent part that: "If the defendant pleads guilty, *the sentencing proceeding shall be conducted before a jury* impaneled for that purpose." [Emphasis added.] G.S. 15A-2001 provides:

> *Capital offenses; plea of guilty.* — Any person who has been indicted for an offense punishable by death may enter a plea of guilty at any time after his indictment, and the judge of the superior court having jurisdiction may sentence such person to life imprisonment or to death pursuant to the procedures of G.S. 15A-2000. Before sentencing the defendant, *the presiding judge shall impanel a jury* for the limited purpose of hearing evidence and determining a sentence recommendation as to the appropriate sentence pursuant to G.S. 15A-2000. The jury's sentence recommendation in cases where the defendant pleads guilty shall be determined under the same procedure of G.S. 15A-2000 applicable to defendants

who have been tried and found guilty by a jury. [Emphasis added.]

In this jurisdiction, it is a well-established rule of statutory construction that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must adhere to its plain and definite meaning. *State ex rel. Utilities Comm'n v. Edmisten*, 291 N.C. 451, 232 S.E. 2d 184 (1977). The statutes in question provide in part that, "If the defendant pleads guilty, a sentencing proceeding *shall* be conducted before a jury . . ." and "the presiding judge *shall* impanel a jury." [Emphasis added.] As used in statutes, the word "shall" is generally imperative or mandatory. *Black's Law Dictionary* 1541 (4th rev. ed. 1968). *Accord: Poole v. Board of Examiners*, 221 N.C. 199, 19 S.E. 2d 635 (1942); *Davis v. Board of Education*, 186 N.C. 227, 119 S.E. 372 (1923); *State ex rel. Battle v. Rocky Mount*, 156 N.C. 329, 72 S.E. 354 (1911). It is clear from the language of the statutes that upon a plea of guilty in a capital case the trial judge is required to impanel a jury to determine the sentence to be imposed. In instant case, the trial judge properly followed the legislative mandate expressed in Article 100 of Chapter 15A.

[2] Defendant assigns as error the ruling of the trial judge permitting the District Attorney to challenge for cause seven prospective jurors because of their disbelief in capital punishment. The record indicates that the trial judge excused the seven individuals in question only after their assertion that under no circumstances would they return a verdict which would result in the imposition of the death penalty. Based on *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), we held in *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), that excusal for cause of any juror who states that under no circumstances would he return a verdict which would result in the imposition of the death penalty is constitutionally permissible. Thus, in instant case, the trial judge properly excused the challenged prospective jurors.

[3] Defendant next contends that the trial court erred in denying his motion for individual voir dire and sequestration of jurors during voir dire. In his brief, defendant cites no authority in support of this contention. G.S. 15A-1214(j) provides that: "In capital cases the trial judge for good cause shown may direct that jurors

be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." This provision vests in the trial judge discretion to allow individual voir dire and sequestration of jurors during voir dire. It is well settled in North Carolina that the trial judge has broad discretion to see that a competent, fair and impartial jury is impaneled and rulings of the trial judge in this regard will not be reversed absent a showing of abuse of discretion. *State v. Lee*, 292 N.C. 617, 234 S.E. 2d 574 (1977); *State v. Waddell*, 289 N.C. 19, 220 S.E. 2d 293 (1975), *death sentence vacated*, 428 U.S. 904. Defendant argues that collective voir dire of jurors in panels as to their familiarity with the crime, the victim or the probability of defendant's guilt or innocence will make all jurors aware of prejudicial and possibly incompetent material, thereby rendering it impossible to select a fair and impartial jury. He further argues that collective voir dire precluded the candor and honesty on the part of the jurors which was necessary in order for counsel to intelligently exercise his peremptory challenges. This is mere speculation on defendant's part, and he has made no showing that the trial judge's denial of his motion amounted to an abuse of discretion. This assignment of error is overruled.

[4] Defendant assigns as error the trial court's refusal to grant his motion to require the State to refute the defense of insanity. Defendant argues that *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975), requires reallocation of the burden of proof with respect to the defense of insanity. We expressly rejected the same argument in the recent case of *State v. Caldwell*, 293 N.C. 336, 237 S.E. 2d 742 (1977), *cert. denied*, 434 U.S. 1075. Defendant acknowledges that *Caldwell* is contrary to his position and has shown nothing which requires reconsideration of that decision.

[5] Defendant contends that the trial judge erred in denying his motion for appointment of associate counsel. Defendant cites no authority in support of this contention but states that additional counsel should have been appointed. As in the case of providing private investigators or other expert assistance to indigent defendants, we think the appointment of additional counsel is a matter within the discretion of the trial judge and required only upon a showing by a defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of

his defense or that without such help it is probable that defendant will not receive a fair trial. *See State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977); *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). There is nothing in the record to indicate that his court appointed counsel handled his appeal other than in a competent manner. While the trial judge could, in his discretion, have appointed additional counsel, his refusal to do so can by no stretch of the imagination be deemed an abuse of discretion.

[6] Defendant assigns as error the trial court's refusal to increase the number of his peremptory challenges. He contends that substantial pretrial publicity and the State's successful challenge for cause of prospective jurors opposed to capital punishment were advantages which benefited the State, and his motion for additional challenges should have been allowed to offset those advantages. Defendant cites no authority in support of his contention, and we can find none. G.S. 15A-1217 provides that in capital cases each defendant is entitled to fourteen peremptory challenges. The statute does not authorize trial judges to permit either the State or a defendant to exercise more peremptory challenges than specified by statute. In instant case, the record does not reveal how many peremptory challenges, if any, defendant used. Moreover, defendant does not contend that the trial judge's denial of his motion resulted in the acceptance of any jurors over defendant's challenge. Even if the trial judge had authority to increase the number of peremptory challenges, a power which is precluded by G.S. 15A-1217, we fail to perceive any prejudice to defendant resulting from the denial of this motion.

[7] Defendant next contends that the trial court erred in denying his motion to suppress his in-custody confession which he argues flowed from and was tainted by the State's acquisition of a .38 caliber pistol used by defendant in an unrelated homicide. Prior to trial, the trial judge conducted a voir dire hearing to determine the admissibility of defendant's confession. Captain Webster of the Caldwell County Sheriff's Department testified that on 31 October 1977 defendant was a suspect in the murder of one Mabel Sherrill. On that same day, Webster took defendant into custody in Hickory, North Carolina, and asked defendant if he would accompany him to Caldwell County. Defendant agreed to return to Caldwell County, and Captain Webster informed him

on his rights. After stating that he understood his rights, defendant told Webster that he had a .38 caliber pistol at his brother's house. The two men went to the brother's house and obtained the pistol which had belonged to the deceased, Mabel Sherrill. After obtaining the pistol, Webster again informed defendant of his rights. Defendant was again informed of his rights at the Caldwell County Sheriff's Department by members of that department to whom he confessed killing both Mrs. Sherrill and Bobby Bartlette.

Defendant testified on voir dire that Captain Webster did not inform him of his rights until he had asked and been told about the .38 caliber pistol which had belonged to Mrs. Sherrill. Defendant thus contends that the pistol and the confessions which flowed from its recovery were tainted evidence which should have been excluded. We do not agree. Based upon the evidence offered on voir dire, the trial judge found as a fact that no information was obtained from defendant until after he had been advised of his rights and concluded that defendant's statements were understandingly and voluntarily made after he was advised of all of his constitutional rights. The trial judge's finding that an accused freely and voluntarily made an inculpatory statement will not be disturbed on appeal when the finding is supported by competent evidence even when there is conflicting evidence. *State v. Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976); *State v. Blackmon*, 280 N.C. 42, 185 S.E. 2d 123 (1971); *State v. Haskins*, 278 N.C. 52, 178 S.E. 2d 610 (1971).

In instant case, defendant concedes that there was sufficient evidence to support the trial judge's ruling.

[8] Defendant contends that the trial court erred in allowing the State's challenge for cause of Mrs. Alva Adams in violation of the rule set forth in *Witherspoon v. Illinois, supra.* The record indicates the following exchange during the voir dire of prospective juror Adams:

　　Q. Do you have any moral or religious scruples against the use of capital punishment in a situation you think calls for it?

　　A. Well, I'm not sure. I just can't make up my mind.

　　Q. . . . Do you just feel like, maybe you couldn't do that even if it was so bad that you felt it called for it?

State v. Johnson

A. Well, I'm not sure whether I could say capital punishment or not.

Q. Ma'am?

A. I'm not sure whether I could say the gas chamber or not.

Q. So you feel like, then, that you would not vote in favor of the death penalty under any facts or circumstances no matter what the aggravation was. Is that right?

A. Probably.

Q. All right. We'll challenge her for cause.

THE COURT: All right, stand aside, ma'am.

At this time, the defendant objected to this challenge for cause and requested permission to ask the excused juror a series of questions inquiring into her feelings concerning capital punishment, which request was denied.

MR. HEDRICK: I would like to ultimately ask the juror if the Judge instructed her regarding the law, and recognizing her sworn duty as a juror, as much as she might dislike it, could she consider a verdict which might result in the death penalty? I submit that if she could do that, then she is not challengeable for cause under the Witherspoon decision.

The juror being recalled, was questioned and answered as follows:

Q. Mrs. Adams, do you have any moral scruples against the use of capital punishment? Yes or no.

A. Yes.

Q. All right. Now, I take it, then, that even if the State satisfied you beyond a reasonable doubt that this was so vicious and such a cruel killing, based on the law the judge will give you, you would not vote in favor of the death penalty under any facts or circumstances no matter how aggravated the case, no matter what the facts were. Is that correct? You wouldn't vote for the death penalty?

A. I don't think so.

Q. Thank you. Challenge for cause.

THE COURT: Stand aside.

Although Mrs. Adams expressed reservations about the death penalty, her answers, collectively or individually, cannot be construed to give the impression that she was unequivocally opposed to the death penalty and would not under any circumstances vote for its imposition. Therefore, the trial judge erred in allowing the State's challenge for cause of Mrs. Adams. *State v. Bernard*, 288 N.C. 321, 218 S.E. 2d 327 (1975); *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975). The record does not indicate, however, that any other juror was excused for cause who did not state that he was unequivocally opposed to the death penalty. We are not confronted then with the *systematic* exclusion of prospective jurors, generally opposed to the death penalty as was the case in *Witherspoon v. Illinois, supra.* In instant case, there is no suggestion that the jurors who were impaneled were prejudiced against defendant or were otherwise not qualified or competent to serve. Thus, the trial judge's error in excusing prospective juror Adams for cause was not prejudicial. *State v. Bernard, supra; State v. Monk, supra.*

[9] Defendant next contends that the trial judge erred in allowing the District Attorney to argue to the jury that the only way to protect society, themselves and their children from defendant was to impose the death penalty, thereby impermissibly suggesting the possibility of parole. In support of his contention, defendant refers to the following excerpts from the District Attorney's argument:

> . . . Now, make no bones about it, Ladies and Gentlemen of the jury, you are the only thing standing between him and freedom to walk around again.

> *         *         *

> . . . The State says and contends to you, common sense will tell you, that the only way you can ever be sure this man will never walk out again is to give him the death penalty.

> *         *         *

. . . And I say to you this, the only way you can ever be sure that he will never do this again is to sentence him to death by the inhalation of lethal gas in Raleigh.

\*    \*    \*

. . . The State is asking you now to sentence him to die in the gas chamber in Raleigh, because that's the only place, that's the only place where you can be sure that what you see sitting before you would not kill another child or kill another old woman in his life . . . .

We recognize that a defendant's eligibility for parole is not a proper matter for consideration by the jury. *State v. Cherry, supra; State v. McMorris,* 290 N.C. 286, 225 S.E. 2d 553 (1976). However, as the above-quoted excerpts show, the District Attorney never used the word parole nor did he tell the jury that if defendant received a life sentence he could be out in twenty years. He did argue vigorously for imposition of the death penalty, and this Court has held that in a prosecution for first degree murder it is the right and duty of the prosecuting attorney to seek the death penalty. *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated,* 408 U.S. 939. We are of the opinion that the District Attorney's argument did not suggest the possibility of parole.

[10] Defendant assigns as error the trial judge's refusal to allow the defendant to present during the sentencing phase of the trial, an eyewitness account of a gas chamber execution. G.S. 15A-2000(a)(3) provides in part that, "Evidence may be presented as to any matter that the court deems relevant to sentence . . . or . . . to have probative value . . . ." In the recent capital case of *State v. Cherry, supra,* we reiterated that factors to be considered in sentencing are the defendant's age, character, education, environment, habits, mentality, propensities and record, all of which are relevant to the jury's determination of punishment. Defendant contends that the testimony of an eyewitness to a 1957 gas chamber execution was relevant to the jury's determination of defendant's sentence. The evidence was in no way connected to defendant, his character, his record or the circumstances of the charged offense. It was totally irrelevant and, therefore, properly excluded by the trial judge.

[12]    Defendant contends that the trial judge erred in allowing the District Attorney to state a personal opinion about the evidence and to argue matters outside the record including his experiences, stories he had heard and other cases he had been involved in or of which he had knowledge. The following statements to which defendant now takes exception, even though he raised no objection at trial, were made during the sentencing phase of the trial:

> . . . And, of course, the State says and contends to you from the evidence that you've seen here that this particular homicide is, if I've ever seen one, and I've seen a whole lot of them before, is especially cruel, heinous and atrocious.

*   *   *

> . . . You have had laid before you, and I've been your District Attorney for eight years, one of the worst murder cases I've ever seen. My Daddy was in the SBI for a number of years, law enforcement. I heard him talk as a child, just like Hugh Wilson has got his boy over here today. You hear that talk around the dinner table, and it's just about as bad as anything I've ever heard all of my life. I was a child growing up. I think that this case, and the facts that you have in front of you now, absolutely and without qualification call for the imposition of the death penalty.

*   *   *

> . . . But when I first heard about this case, I—what bothers me now, what if that was my boy there. That just tears me up.

[11, 12]    It is well settled in North Carolina that counsel is allowed wide latitude in the argument to the jury. *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976); *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970), *rev'd on other grounds,* 403 U.S. 948. Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence. *State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975). The control of the arguments of counsel must be left largely to the discretion of the trial judge, *State v. Britt, supra; State v. Monk, supra,* and the appellate

courts ordinarily will not review the exercise of the trial judge's discretion in this regard unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations. *State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976). In capital cases, however, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it. *State v. Smith*, 294 N.C. 365, 241 S.E. 2d 674 (1978). Assuming arguendo that the statements of which defendant complains were improper, the impropriety was not so gross or excessive to compel us to hold that the trial judge abused his discretion in not correcting them or that defendant is entitled to a new trial.

[13]   Defendant next contends that the trial judge erred in failing to instruct the jury on one of the provisions of G.S. 15A-2000(b). The record indicates that prior to trial defendant tendered a written request that the trial judge include in his charge the following instruction should the case proceed to the sentencing phase:

> If the jury cannot within a reasonable time unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment, provided, however, that the judge shall in no instance impose the death penalty when the jury cannot agree unanimously on its sentence recommendation.

The record does not show that the trial judge ever ruled on this request. The requested instruction was not included in the trial judge's charge, and no exception to the charge was taken. In fact, at the conclusion of his charge on the sentencing phase, the trial judge inquired of defense counsel, "Anything further from the defendant?" To this inquiry, defense counsel responded, "No, Your Honor." Since the request was not renewed at this time and no exception was taken, defendant is not now entitled to assign as error the trial judge's failure to give the requested instruction. Rule 10, North Carolina Rules of Appellate Procedure.

More importantly, however, the trial judge's authority to impose a life sentence upon the jury's failure to unanimously agree

upon a sentence recommendation within a reasonable time is not a proper matter for jury consideration. G.S. 15A-2000(b) provides, in part, that after hearing the evidence, argument of counsel, and instructions of the court, the jury shall render a sentence recommendation based upon its consideration of the aggravating and mitigating circumstance or circumstances it finds to exist. At best, the requested instruction would be of absolutely no assistance to the jury in making its recommendation. At worst, the instruction would permit the jury to escape the onerous task of recommending the sentence to be imposed. The trial judge's refusal, or failure, to give the requested instruction was in all respects proper.

[14] Neither was there error in the trial judge's refusal to grant defendant's motion for imposition of a sentence of life imprisonment when the jury had failed to return a verdict after deliberating for two hours and thirty-nine minutes. This motion was made at approximately 4:45 p.m. after one of the jurors stated that it would be an extreme hardship on her to provide for the care of her twelve month old child if she were required to stay beyond a certain hour in the afternoon. The trial judge indicated that, as the jury had been in the box until approximately 5:45 p.m. the two previous days, they would be released at a reasonable hour and denied the motion. The sentence recommendation was returned about one hour later at 5:45 p.m. Defendant does not contend that the jury was pressured into agreeing on a sentence recommendation but apparently contends that it was unreasonable to allow them to continue deliberation after two hours and thirty-nine minutes. We cannot agree that the period of three hours and thirty-nine minutes, required for the jury to agree on a sentence recommendation, was unreasonable. Moreover, what constitutes a "reasonable time" for jury deliberation in the sentencing phase should be left to the trial judge's discretion. We perceive no abuse of discretion, and defendant has shown none.

This assignment of error is overruled.

[15] Defendant contends that the trial judge erred in refusing to set aside the jury's sentence recommendation of death and entering judgment in accordance therewith, since the sole aggravating circumstance submitted to the jury was not supported by the

evidence. There was sufficient evidence to support the jury's finding that the killing was "especially heinous, atrocious, or cruel." Moreover, we do not think Article 100 of Chapter 15A confers upon the trial judge the power to disturb the jury's sentence recommendation. G.S. 15A-2002 provides that if the jury recommends a sentence of death, the trial judge *shall* impose a sentence of death, and if the sentence recommendation is life imprisonment, the trial judge *shall* impose a sentence of life imprisonment. This section clearly indicates the Legislature's intention that the jury's sentence recommendation be binding on the trial judge. In addition, G.S. 15A-2000(d)(2) confers only upon this Court, not the trial court, the power to overturn a death sentence "upon a finding that the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death . . . ." The trial judge properly entered judgment in accordance with the jury's sentence recommendation.

Finally, defendant contends that the trial court erred in excluding from the record on appeal a juror's affidavit stating in substance that photographic exhibits were taken into the jury room, and a newspaper clipping indicating that the possibility of parole was a major consideration in the jury's deliberation. Although the record is silent on this point, defendant states in his brief that seven jurors were questioned concerning whether the pictures were taken into the jury room. Two jurors including the one whose affidavit was excluded stated that pictures were taken into the jury room. The other five jurors who responded indicated that the pictures were not taken into the jury room. The jurors were not questioned as to whether the possibility of parole played a part in their deliberations. In setting the record on appeal, the trial judge entered an order which stated in part:

\* \* \*

It appearing to the court that the defendant appellant has included in the record on appeal an affidavit of a juror and newspaper clipping, a copy of which is attached hereto and incorporated by reference, said affidavit stating in substance that the photographic exhibits were taken into the Jury Room; and

It further appearing to the court that the State in its countercase on appeal has objected to the inclusion of said affidavit and newspaper clipping as not being a part of the record on appeal; and

It appearing that the transcript of said trial does not indicate that the photographic exhibits were taken into the Jury Room; and

It appearing to the court and the court finding as a fact that the transcript does not reflect that the photographic exhibits were taken into the Jury Room and that the said juror's affidavit should not constitute a part of the record on appeal;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the juror's affidavit and newspaper clipping not be included in the record on appeal in the above styled cause.

[16] Rule 11(c) of the North Carolina Rules of Appellate Procedure provides that if the parties are unable to agree on the record on appeal, it becomes the duty of the trial judge to settle the record. *See, State v. Sanders*, 280 N.C. 67, 185 S.E. 2d 137 (1971). This the trial judge did, and defendant excepted to his exclusion of the two items in question from the record on appeal. However, the action of the trial judge in settling the record is final and will not be reviewed on appeal. *State v. Gooch*, 94 N.C. 982 (1886). Defendant's remedy, if any, would have been by certiorari. *State v. Allen*, 283 N.C. 354, 196 S.E. 2d 256 (1973).

[17] More importantly, however, we perceive no purpose which would have been served by inclusion of the juror's affidavit and the newspaper clipping other than impeachment of the verdict. As we recently stated in *State v. Cherry, supra*, such evidence would only be allowed pursuant to the provisions of G.S. 15A-1240:

*Impeachment of the verdict.* —(a) Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined.

(b) The limitations in subsection (a) do not bar evidence concerning whether the verdict was reached by lot.

State v. Johnson

(c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns:

(1) Matters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him; or

(2) Bribery, intimidation, or attempted bribery or intimidation of a juror.

Any evidence relative to the jury's consideration of the possibility of parole would be excluded by G.S. 15A-1240(a). Even if the jury did take the pictures into the jury room, the pictures had been admitted into evidence and in no event would consideration of them "violate the defendant's constitutional right to confront the witnesses against him." Therefore, the juror's affidavit concerning the pictures could not have been considered pursuant to G.S. 15A-1240(c)(1). For reasons stated, we hold that the trial judge properly excluded the affidavit and the newspaper clipping from the record on appeal.

[18] Defendant does not contend that there was error in the trial judge's instructions. However, in view of our holding in *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979), (decided 4 September 1979), we are of the opinion that defendant is entitled to a new trial upon the sentencing phase of his trial because of the inadequacy of the court's instructions on the mitigating circumstance set out in G.S. 15A-2000(f)(6) which provides: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." As to this mitigating circumstance, the trial judge charged the jury:

That is, the second mitigating circumstance listed is: The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. That means that his capacity to recognize what he was doing was a criminal act, or his capacity to follow the law, was lessened by reason of an impairment of his capacity in those respects.

In *State v. Johnson, supra,* defendant was convicted of murder and sentenced to death in a homicide not related to instant case. We there held that a virtually identical instruction on this mitigating circumstance was insufficient. In both cases, psychiatrists testified that in their opinion defendant knew right from wrong at the time of the killings. They also indicated, however, that defendant exhibited schizophrenic tendencies.

In instant case, Dr. James Groce, a Staff Psychiatrist at Dorothea Dix Hospital, testified, in part, as follows:

. . . Some of his responses indicated a schizophrenic disturbance . . . .

\*   \*   \*

The defendant has never had a major psychotic episode, that is, he has never completely lost touch with reality, although he has symptoms of schizophrenia, which condition is probably of long standing, beginning in early adolescence and continuing to the present.

\*   \*   \*

I conducted a variety of tests with the defendant and his responses suggested a schizophrenic disturbance . . . . The defendant had a high peak or score in the schizophrenic problem area.

\*   \*   \*

There are several theories as to the cause of schizophrenia, one of which is that it results from certain chemical changes that take place in the central nervous system and sexual excitement changes the chemistry of the central nervous system.

During the guilt-determination phase of the trial, defendant testified, in part:

. . . I offered him ten ($10.00) dollars to have sex with me. He refused at which time something snapped in my head and I strangled him . . . .

Defendant's statement considered in conjunction with Dr. Groce's subsequent testimony that in his opinion defendant had a high

peak score in the schizophrenic problem area, which condition of long standing might be triggered by sexual excitement, raises a strong inference that at the time of the killing defendant's schizophrenia had surfaced. In *State v. Johnson, supra*, we stated, with reference to the mitigating circumstance in question:

> . . . This mitigating circumstance may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

In that case, the vice in the trial judge's instruction was his failure to explain the difference between defendant's capacity to know right from wrong, and the *impairment* of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

In instant case, Dr. Groce testified that defendant knew right from wrong at the time of the killing. However, Dr. Groce's testimony concerning defendant's schizophrenia and the possible cause thereof, when considered in light of defendant's testimony suggesting an event which might have triggered the schizophrenia, lends considerable support to defendant's contention that his capacity was impaired at the time of the killing. Therefore, the trial judge's instruction concerning this mitigating circumstance was, as in *State v. Johnson, supra*, prejudicially insufficient.

[19] Defendant next contends that the trial court erred in allowing into evidence certain pictures of the body of Bobby Bartlette as it appeared some two months subsequent to his death, in an advanced stage of decomposition and after being partially ravaged and dismembered by animals.

Although there must be a new trial in the sentencing phase of the trial because of deficiencies in the charge, we deem it

necessary to consider this assignment of error since the questions here presented may arise at the new trial on the sentencing phase. We are of the opinion that the admission of the photographs constituted prejudicial error in the sentencing phase of the trial. However, in view of the overwhelming evidence of guilt, the admission of the challenged photographs was harmless error beyond a reasonable doubt in the guilt determination phase of the trial. *Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967).

Prior to trial, defendant filed a motion to suppress any photographs of the remains of the victim. A pretrial evidentiary hearing was held pursuant to defendant's motion, and eighteen photographs were identified by S.B.I. Agent Lester. The trial judge ordered four of these photographs to be suppressed and refused to suppress the remaining fourteen. At the guilt determination phase of the trial, five photographs of the remains of the victim's body were introduced into evidence over defendant's objections. One of the photographs had been ordered suppressed at the pretrial hearing. The photographs in question show portions of the victim's body, apparently dismembered by wild animals, found some two months after the killing. Defendant made no contention that the trial judge failed to properly instruct the jury that the photographs were admitted into evidence for the sole purpose of illustrating the testimony of the witness.

Ordinarily in a prosecution for homicide, properly authenticated photographs may be used to illustrate the testimony of a witness concerning the location and condition of the victim's body even though the photographs are gruesome and shocking. *State v. Chance*, 279 N.C. 643, 185 S.E. 2d 227 (1971), *death sentence vacated*, 408 U.S. 940; *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969), *rev'd on other grounds*, 403 U.S. 948; *State v. Stanley*, 227 N.C. 650, 44 S.E. 2d 196 (1947). However, this rule is not inflexible, and our Court has recognized certain qualifications to the rule.

In *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969), the defendant was convicted of second degree murder, and during the course of the trial, three photographs of the victim were admitted into evidence portraying his lifeless body in a funeral home with

projecting probes indicating the entry and exit of the fatal bullet. The victim was lying in a bed when he was shot, and the evidence was uncontradicted as to the cause of death. Holding that these photographs were without probative value, the Court, speaking through Justice Bobbitt, later Chief Justice, in part, stated:

> "If a photograph is *relevant and material*, the fact that it is gory or gruesome, and thus may tend to arouse prejudice, will not alone render it inadmissible." (Our italics.) Stansbury, North Carolina Evidence, Second Edition, § 34, pp. 66-67; *State v. Porth*, 269 N.C. 329, 337, 153 S.E. 2d 10, 16. But where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors. *State v. Foust*, 258 N.C. 453, 460, 128 S.E. 2d 889, 894.

We also note that it is the view of this Court that evidence should be excluded when its prejudicial effect outweighs any probative force it may have upon the issues before the Court. *Pearce v. Barham*, 267 N.C. 707, 149 S.E. 2d 22 (1966); *Electric Company v. Dennis*, 259 N.C. 354, 130 S.E. 2d 547 (1963); *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963). *See also*, Annot., 73 ALR 2d 769, Later Case Service, Section 3.5 (Cum. Supp. 1979).

In instant case, the single relevant photograph was State's Exhibit 12 which portrays the nylon fish stringer around the remains of the victim's neck. This exhibit corroborated the confession of defendant to the effect that he strangled the victim. The other photographs, all of which were repetitive, depicted the dismembered bones of the child. There was no evidence that defendant mutilated or dismembered the body of deceased. Defendant had made an oral, handwritten confession in which he stated that he *strangled* Robert Alonzo Bartlette III. The use of these gory and gruesome photographs as substantive evidence did not tend to prove any material fact at issue.

We find no error sufficient to warrant a new trial in the guilt determination phase of the trial; however, for reasons stated, there must be a new trial on the sentencing phase of the trial.

In the guilt determination phase of the trial — No error.

In the sentencing phase of the trial — New trial.

Justice EXUM dissenting in part.

I fully concur in the result reached and with all aspects of the majority opinion except the dictum that a trial judge should not inform a jury considering whether to impose the death penalty that failure of the jury to agree on the sentence within a reasonable time will result in the judge's imposing a life sentence under G.S. 15A-2000(b). Since the majority has properly held that defendant waived his right to complain about the judge's failure to give such an instruction and since the matter must be returned for a new sentencing proceeding, the proposition with which I disagree is not necessary to decide this case.

More importantly, this restriction on a trial judge's communication with the jury seems unwise and actually to run counter to the reasons given by the majority for it. The majority says that such an instruction at best "would be of absolutely no assistance to the jury in making its recommendation. At worst, the instruction would permit the jury to escape the onerous task of recommending the sentence to be imposed." To the contrary I believe the instruction would inform the jury that it cannot escape the task of recommending a sentence. Whatever it does some sentence will be imposed as a result. If the jury unanimously agrees on a sentence of life imprisonment or death, that sentence to which there is unanimous agreement shall be imposed. On the other hand if the jury cannot agree, then a sentence of life imprisonment will be imposed. Since its failure to agree is tantamount to a final determination of the case and has the same legal effect as a unanimous decision for life imprisonment, the jury should be instructed on this effect of its disagreement. Being fully informed as to the final legal effect of a disagreement, the jury is bound to be in a position to perform its function more intelligently.

The Pattern Jury Instruction Committee of the Conference of Superior Court Judges has recommended that this instruction be given. N.C.P.I. — Crim. 150.10. The instruction recommended by this committee reads:

State v. Johnson

"If you [the jury] unanimously recommend that the defendant be sentenced to death, the Court will be required to impose a sentence of death. If you unanimously recommend a sentence of life imprisonment, the Court will be required to impose a sentence of imprisonment in the State's prison for life. If you are unable, within a reasonable time, unanimously to agree on your recommendation, the Court shall impose a sentence of life imprisonment."

A footnote to the last sentence of this instruction reads as follows:

"The Committee considered deleting this sentence on the ground that the information which it contains might unduly encourage juror holdouts and early deadlocks. However, since the consequences of a jury deadlock are different at the separate sentencing proceeding under G.S. § 15A-2000 than at the guilt phase of any trial, the Committee believes that the jury is entitled to have this information. To avoid undue emphasis, it is given only once, and at the beginning of the instruction."

I believe the committee, for the reasons it stated, wisely determined to include such an instruction. Normally a jury deadlock results in a mistrial and presentation of the case in its entirety to a new jury. A jury would be so instructed in the event of a deadlock on the guilt phase of the proceeding. Many jurors of their own knowledge know that this is normally the result of a deadlock. In a death case a jury should not be permitted to labor under the incorrect assumption that a deadlock on the question of sentence would result in a new proceeding before a new jury.

Further, if a jury is not so instructed at the outset and then deadlocks on the question of sentence, should the trial judge then be entitled to inform them of the consequences in an effort to *avoid* a deadlock? If he does, a defendant thereafter sentenced to death would be in a good position to argue that the verdict was unduly coerced. The better practice is to follow the recommendation of the Pattern Jury Instruction Committee and routinely include such an instruction even absent a request by either side.

Frankly I am at a loss to know whether failure to give such an instruction prejudices the state or the defendant. If it is not

given the jury knows only that failure unanimously to recommend death will preclude the death penalty being imposed in this proceeding. It may, however, assume that by being deadlocked some other jury at some future time will have to make the decision. It seems to me that a jury in this state of mind might more easily deadlock than a jury that knows a deadlock will result in a life sentence. In the latter case those jurors favoring death are likely to urge their views on the others more vociferously. If this is so, failure to give the instruction would tend to prejudice the state.

In a case where defendant asks for the instruction for reasons best known to him, I believe he is entitled to have it.

Clearly the attorneys in the case can read the statute to the jury on the effect of a disagreement. G.S. 84-14; *State v. McMorris*, 290 N.C. 286, 225 S.E. 2d 553 (1976); *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974). If they do, it seems particularly unwise to preclude the trial judge from impartially instructing the jury on the law applicable to the point.